775 S.E.2d 701

Daniel RICIGLIANO, Jr., Appellant,

v.

Linda RICIGLIANO, Respondent.

Appellate Case No. 2012–212586.
No. 5325.

Court of Appeals of South Carolina.

Heard Dec. 9, 2014.
Decided July 15, 2015.

David L. DeVane, and Theresa Marie Wozniak Jenkins of Charleston, of Summerville, for appellant.

Elizabeth Murray Hight, of Hight Law Firm, LLC, of Summerville, for respondent.

HUFF, J.

In this domestic relations matter, Daniel Ricigliano, Jr. (Husband) appeals the order of the family court asserting the court erred in (1) awarding him rehabilitative alimony instead of permanent periodic alimony and making the award conditional, (2) equally dividing the parties' marital estate, (3) failing to hold Linda Ricigliano (Wife) in contempt for violating the court's order restraining her from disparaging him in their child's presence, and (4) failing to order Wife to contribute to Husband's extraordinary attorney's fees and costs. We affirm in part, reverse in part, and remand.

## FACTUAL/PROCEDURAL HISTORY

The parties were married in New York on November 2, 1996, and have one child from the marriage (Daughter), who

was ten years old at the time of the hearing in this matter. In 2005, the parties relocated to South Carolina to advance Wife's career with United States Customs and Border Protection (hereinafter Customs).

On January 17, 2009, the parties separated after Wife informed Husband in October 2008 that she did not love him and wanted to separate. Shortly after the separation, on January 23, 2009, Husband filed this action seeking, among other things, a divorce on the basis of Wife's adultery. Husband first had suspicions Wife was committing adultery in 2007 when he discovered sexually explicit images of another man and somewhat seductive pictures of Wife on Wife's cell phone. According to Husband, when he confronted Wife about the pictures, she denied having any sexual encounters with the man, indicating she and this man were just playing around, and Husband forgave Wife for engaging in such behavior. Husband further denied Wife told him about any other affairs or other men involved in her life. In December 2008, Husband again became suspicious of Wife and hired Steven Abrams, an attorney and expert computer forensics examiner, to make a clone of Wife's computer. Abrams' report indicated Wife was having an extramarital affair with an individual named Steven Goldfarb, which appeared to start in Fall 2008. E-mails recovered between Wife and Goldfarb also implied the two may have been contemplating having a baby together. Wife did in fact get pregnant while Wife and Husband were separated and had Goldfarb's baby in September 2010. Husband alleged in his complaint that he believed Wife commenced an adulterous relationship, which he had not condoned. Wife denied this allegation in her Answer. When Husband's Interrogatories raised a question concerning Wife's involvement in affairs, Wife pled "her 5th Amendment right" in August 2009. When also asked to provide the name, address and phone numbers of any individuals with whom she had sexual relations since their marriage, Wife again pled "her 5th Amendment right." In November 2009, Wife amended her Answers to Interrogatories to admit her sexual relationship with Goldfarb. In her June 2010 deposition, Wife finally admitted she had engaged in four extramarital affairs during their marriage.

Husband is a high school graduate who started a company called Prime Builders in New York around 1998 or 1999. After the parties' move to South Carolina, Husband became employed with the company Southern Specialties in August 2006. He also restarted Prime Builders in South Carolina in 2007, while he was continuing to work for Southern Specialties. However, the relocation from New York to South Carolina was a difficult transition for his business, and Husband testified he had to start over and build up his clientele. In Spring 2009, Husband was laid off from Southern Specialties when the company closed. Husband obtained his South Carolina Commercial Residential Builders License in 2009 and was self-employed with Prime Builders at the time of the hearing in 2011.

Husband testified that during the marriage, he cooked and cleaned and maintained the household. He stated he repaired anything that was broken in the home and remodeled the kitchen, bathrooms, living room, and dining room. Wife was responsible for handling the finances and paying the bills. Husband also testified the parties dined out two to three times a week, they made donations to their church as well as charitable donations, and they entertained in their home and threw parties at their pool. He estimated he worked an average of thirty-five to forty hours a week, while Wife worked over forty hours and traveled often for work. Because of his flexible schedule, he had more time to take care of Daughter and the house, and he cared for Daughter when Wife was travelling. He claimed he was the primary caretaker of Daughter prior to the parties' separation. Husband testified his standard of living had been affected "[q]uite a bit" since the parties' separation, and he struggled to pay bills. At the time of the hearing, he had "maxed everything out" on his credit cards and was living in a smaller apartment.

Other than his current income, there is little, and somewhat conflicting, evidence of Husband's financial situation in the record before us. Husband lost the income from Southern Specialties in 2009. At some point, Prime Builders was not doing well because of the economy, but Husband agreed it had improved. However, he characterized it as "turning around" at that point in time and stated he was "still not making decent money." Husband testified he was making about

$2,100 a month at the time of the hearing, and his financial declaration showed he had a gross monthly income of $2,136. Additionally, there is a notation in a "Relocation Proposal" document, developed in the parties' counseling sessions by Dr. Gibbs, indicating that from a review of Husband's financial history, it appeared that from 2003 to 2010, Husband made approximately $120,000. However, during Husband's cross-examination, there is an indication that Husband may have testified in his 2010 deposition that his income total for the three previous years had been $354,000.[1] Husband testified his income fluctuated with the economy. This brief and vague reference to Husband's deposition testimony is the only indication Husband may have made a substantial income in the past, other than Wife's assertion that there were times in South Carolina that Husband made as much, if not more, money than she did.

Wife, who holds a degree in criminology with a minor in criminal justice, began working for Customs as an intern while in college and was employed by Customs upon graduation in June 1994. She was originally hired to work at the Port of Buffalo in New York and worked there for twelve years. Wife testified Husband's business did not support their household, but her job did. She did not have training and promotion opportunities in Buffalo, which factored into her decision to leave Buffalo. During a Christmas 2004 trip to see her brother in Mt. Pleasant, South Carolina, Wife interviewed for a position in the Port of Charleston and was hired shortly thereafter in 2005. Wife worked in that position for three years, until November 2008, when she was selected for employment in a three-year temporary position in Charleston as a course developer and instructor with Customs. This position was only to last through November 2011, with the possibility of extending the job two times in one-year increments for a total of five years of employment possible if extensions were granted. Both Wife and her supervisor testified Wife's request for extension was denied. Wife was then allowed to request three locations for continued employment with Customs, and she chose Charleston, Columbia, and Greenville, but none of those choices had available openings for her. Wife

---

1. Husband's deposition is not included in the record on appeal.

then applied for positions with the federal government in the Washington, D.C. area, where Goldfarb was headquartered, and she ultimately received a job offer there to begin shortly after the hearing in this matter. Wife noted her income afforded her the opportunity to provide Daughter with private school, health care, extracurricular activities, vacations, clothes, shoes, food, and everything Daughter needs. In order to continue her career with the federal government, she had to relocate. At the time of the hearing, Wife's Charleston employment provided an annual gross income of $87,278, and she was at level GS–13, Step 3 with the federal government. However, the new job in Washington, D.C. came with an offer of a GS–13, Step 6 to insure she would not lose any income.[2] If she passed her performance review, she had the potential of being promoted to the GS–14 level. A GS–14, Step 4 carried a salary of $93,166, and the pay would be adjusted 24.22 percent for the Washington, D.C. locality. Goldfarb testified he believed Wife's upgrade to GS–14 would be at Step 4 and her annual salary would probably be $117,000. Goldfarb was himself at level GS–14, Step 4. Additionally, both Wife and Goldfarb testified they planned to marry as soon as they possibly could. Goldfarb agreed that he and Wife would have a combined household income of "just shy of [a] quarter of [a] million dollars a year." The Washington, D.C. job would be a promotion for Wife.

Following eight days of hearing in July and August 2011, the family court issued an order on January 20, 2012, (1) granting Husband a divorce on the ground of Wife's adultery, (2) awarding primary custody of Daughter to Wife and allowing Wife to relocate with Daughter, (3) awarding Husband rehabilitative alimony of $500 a month "[i]f and only if" Husband chose to relocate within six months of the decree, with any decision to relocate after the six month period foreclosing any payment of alimony, (4) dividing the marital assets not already divided by agreement of the parties fifty-fifty, (5) requiring each party to pay their own attorney's fees and expenses and equally dividing the fees of the court-ordered psychologist and the Guardian ad Litem, with the

---

**2.** It appears the base pay for a position in Washington, D.C. at a particular level is increased substantially to adjust for a higher cost of living.

exception of ordering Wife to reimburse Husband $3,100 toward the fees of his forensic expert, Abrams, and (6) declining to hold Wife in contempt, finding no clear and convincing evidence she purposely or willfully violated any of the court's orders.

## ISSUES

1. Whether the family court erred in awarding conditional alimony and failing to award permanent periodic alimony in light of the duration of the parties' marriage and their educational background, employment history, earning potential, standard of living, and marital misconduct.

2. Whether the family court erred in equally apportioning the parties' marital estate.

3. Whether the family court erred in failing to hold Wife in criminal contempt of court for violating the court's restraining order by repeatedly disparaging Husband in Daughter's presence.

4. Whether the family court erred in inequitably leaving Husband without contribution from Wife for his extraordinary attorney's fees and costs.

## STANDARD OF REVIEW

In family court appeals, an appellate court reviews factual and legal issues de novo. *Simmons v. Simmons,* 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "De novo review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." *Lewis v. Lewis,* 392 S.C. 381, 390, 709 S.E.2d 650, 654 (2011). However, while this court has the authority to find facts in accordance with its own view of the preponderance of the evidence, "we recognize the superior position of the family court judge in making credibility determinations." *Id.* at 392, 709 S.E.2d at 655. Further, de novo review does not relieve an appellant of his burden to "demonstrate error in the family court's findings of fact." *Id.* "Consequently, the family court's factual findings will be affirmed unless appellant satisfies this court that the preponderance of the evidence is against the finding of the [family] court." *Id.* (alteration by court) (quotation marks omitted).

330

## LAW/ANALYSIS

### I. Alimony

 Husband first contends the family court erred in awarding him conditional, rehabilitative alimony and failing to award him permanent periodic alimony. Husband maintains the facts of this case clearly warrant a substantial award of permanent periodic alimony. He argues the award of rehabilitative alimony was neither appropriate nor clearly defined by the family court and the family court failed to address the relevant factors the court should contemplate before awarding rehabilitative alimony or make any factual finding as to the rehabilitative goal an award of such alimony would achieve. Husband also contends the family court erred in making award of the rehabilitative alimony contingent on his relocation to Washington, D.C. We agree.

 "Alimony is a substitute for the support normally incidental to the marital relationship." *Crossland v. Crossland,* 408 S.C. 443, 451, 759 S.E.2d 419, 423 (2014). "Generally, alimony should place the supported spouse, as nearly as is practical, in the same position he or she enjoyed during the marriage." *Id.* (quoting *Allen v. Allen,* 347 S.C. 177, 184, 554 S.E.2d 421, 424 (Ct.App.2001)). "An award of alimony rests within the sound discretion of the family court and will not be disturbed absent an abuse of discretion." *Id.* at 452, 759 S.E.2d at 423.

 In deciding whether to award a party alimony, the family court *must consider* and give appropriate weight to the following factors:

(1) the duration of the marriage together with the ages of the parties at the time of the marriage and at the time of the divorce . . . ; (2) the physical and emotional condition of each spouse; (3) the educational background of each spouse, together with need of each spouse for additional training or education in order to achieve that spouse's income potential; (4) the employment history and earning potential of each spouse; (5) the standard of living established during the marriage; (6) the current and reasonably anticipated earnings of both spouses; (7) the current and reasonably anticipated expenses and needs of both spouses; (8) the marital and nonmarital properties of the parties, including those

apportioned to him or her in the divorce . . .; (9) custody of the children . . .; (10) marital misconduct or fault of either or both parties, whether or not used as a basis for a divorce . . . if the misconduct affects or has affected the economic circumstances of the parties, or contributed to the breakup of the marriage . . .; (11) the tax consequences to each party as a result of the particular form of support awarded; (12) the existence and extent of any support obligation from a prior marriage or for any other reason of either party; and (13) such other factors the court considers relevant. S.C.Code Ann. § 20–3–130(C) (2014). "The court is required to consider *all* relevant factors in determining alimony." *Craig v. Craig*, 358 S.C. 548, 554–55, 595 S.E.2d 837, 841 (Ct.App.2004) (emphasis added); *see also Epperly v. Epperly*, 312 S.C. 411, 415, 440 S.E.2d 884, 886 (1994) (holding the family court failed to address all the required statutory factors and remanding for the family court to redetermine alimony, considering all relevant factors).

 "Although rehabilitative alimony may be an appropriate form of spousal support in some cases, permanent periodic alimony is favored in South Carolina. If a claim for alimony is well-founded, the law favors the award of permanent periodic alimony." *Jenkins v. Jenkins*, 345 S.C. 88, 95, 545 S.E.2d 531, 535 (Ct.App.2001). "Rehabilitative alimony may be awarded only upon a showing of special circumstances justifying a departure from the normal preference for permanent periodic support. The purpose of rehabilitative alimony is to encourage a dependent spouse to become self-supporting after a divorce." *Id.* Rehabilitative alimony "should be approved only in exceptional circumstances, in part, because it seldom suffices to maintain the level of support the dependent spouse enjoyed as an incident to the marriage." *Id.* Additionally, the following factors must be considered in deciding whether rehabilitative alimony is appropriate:

(1) the duration of the marriage; (2) the age, health, and education of the supported spouse; (3) the financial resources of the parties; (4) the parties' accustomed standard of living; (5) the ability of the supporting spouse to meet his needs while meeting those of the supported spouse; (6) the time necessary for the supported spouse to acquire job training or skills; (7) the likelihood that the supported

spouse will successfully complete retraining; and (8) the supported spouse's likelihood of success in the job market. *Id.* Further, "[t]here must be evidence demonstrating the self-sufficiency of the supported spouse at the expiration of the ordered payments for rehabilitative alimony to be granted." *Id.*

We agree with Husband that the family court erred in awarding him conditional rehabilitative alimony and denying him permanent periodic alimony.

The family court order contains one, short paragraph concerning alimony. It states as follows:

[Husband] has few ties to South Carolina and his construction business does not generate enough steady income to be a sufficient reason for him not to relocate to the D.C. area; however, should he choose to relocate he would need to reestablish his business or start over as an employee of someone else. If and only if, [Husband] chooses to relocate within six months of this Decree, [Wife] shall be required to pay him rehabilitative alimony in the amount of $500.00 a month. If [Husband] chooses to stay in South Carolina, it is reasonable to expect his business to continue to grow, therefore he would not require support from [Wife]. Additionally, if [Husband] decides to move to the D.C. area[ ] after the six month window [Wife] shall not be required to pay him any alimony.

Clearly, the family court failed to make the requisite findings under section 20–3–130(C).

As noted, there was conflicting evidence as to Husband's previous earnings in the record. Nonetheless, the record paints a clear picture that, at the time of the divorce and in the preceding two years, Husband's income was substantially lower than that of Wife's and Husband was living well below the standard of living he enjoyed during the marriage. Additionally, the family court's findings are inconsistent, inasmuch as it determined Husband's construction business in South Carolina generated an insufficient income to warrant him not relocating, but at the same time found his business in South Carolina was expected to continue to grow such that he would not need support from Wife were he to remain in South Carolina.

Based upon the record before us, we find the preponderance of the evidence supports an award of permanent periodic alimony. In particular, the consideration of the following factors warrants such an award: (1) the duration of the marriage and ages of the parties; (2) the educational background of each spouse; (3) the employment history and earning potential of each spouse; (4) the standard of living established during the marriage; (5) the current and reasonably anticipated earnings of both spouses; and (6) marital misconduct or fault of either or both parties. The parties were married for over twelve years at the time they separated, were married for fifteen years at the time the divorce was finalized, and were in their late thirties at the time of the hearing. Wife is more educated than Husband, with Wife holding a Bachelor's degree and Husband having only graduated from high school. Wife has maintained steady employment with Customs and was making a substantial income at the time of the hearing with an anticipated promotion in the near future, whereas Husband's income has fluctuated based upon having to start his business over after relocation for Wife's career advancement as well as economic conditions that affected his trade. The parties maintained a good standard of living during the marriage. Wife was poised to increase her income with the relocation and custody award of the family court, while Husband was still in in the process of trying to turn his business around. Lastly, Wife was completely at fault in the breakup of the marriage, having engaged in numerous affairs during the marriage and ultimately getting pregnant and moving on with her latest paramour, and this misconduct both affected the economic circumstances of the parties and contributed to the breakup of the marriage. As to Husband's anticipated earnings we note, while his business was in the process of turning around, the only evidence of record was that he still was not making a "decent" income at the time of the hearing and he had not made much money for at least the last two years. The evidence does not support a finding that his anticipated earnings would support him "as nearly as is practical, in the same position he ... enjoyed during the marriage." *Crossland*, 408 S.C. at 451, 759 S.E.2d at 423. Additionally, to make such a determination, the family court would have had to engage in speculation, as the record is

devoid of evidence of the amount of income Husband is anticipated to receive assuming his business does rebound. *See id.* at 454, 759 S.E.2d at 425 (finding, because the family court must have sufficient evidence upon which to base a determination of a person's earning potential for purposes of awarding alimony, the family court did not err in refusing to engage in speculation as to the benefits Wife might expect to receive, as the family court was not presented with sufficient evidence on the matter). Assuming Husband's business does ultimately improve to the point that he does not need further support, Wife could then bring an action based upon the change in circumstances. *See id.* at 454 n. 5, 759 S.E.2d at 425 n. 5 (finding Husband was not foreclosed from seeking to modify alimony when Wife actually began receiving social security benefits after her sixty-fifth birthday, noting that, though a change in circumstances within the contemplation of the parties at the time the divorce was entered generally would not provide a basis for modifying alimony, if the date and amount of the anticipated change is not ascertainable and the original decree does not prospectively account for the future circumstance, such a modification may be appropriate).

Further, the family court clearly erred in awarding Husband rehabilitative alimony. As noted, the law favors the award of permanent periodic alimony, and rehabilitative alimony may be awarded only in exceptional circumstances, when there has been a showing of special circumstances justifying a departure from the normal preference for permanent periodic support. *Jenkins,* 345 S.C. at 95, 545 S.E.2d at 535. Additionally, the family court failed to consider the appropriate factors in determining whether rehabilitative alimony was proper under the circumstances. *Id.* Finally, there is no evidence demonstrating Husband will be self-sufficient at the expiration of the ordered payments. *See id.* ("There must be evidence demonstrating the self-sufficiency of the supported spouse at the expiration of the ordered payments for rehabilitative alimony to be granted.").

 As to the conditional requirement that Husband relocate in order to receive any alimony, we also find error. The only evidence of record concerning the financial impact of relocating on Husband is his and Dr. Gibbs' testimony that they looked into various alternatives for moving to the D.C.

area and it was not economically feasible for Husband to do so. There is nothing to show the trifling amount of rehabilitative alimony the family court awarded would be sufficient to allow Husband to relocate with financial stability.

In sum, we find Husband is entitled to permanent periodic alimony. We therefore reverse and remand this issue with instruction for the family court to award him permanent periodic alimony after consideration of the requisite factors. *See id.* at 97, 545 S.E.2d at 536 (finding permanent periodic alimony was warranted, reversing the award of rehabilitative alimony, and remanding the issue to the family court for determination of an appropriate award of permanent periodic alimony).

## II. Equitable Distribution

Husband next argues the family court erred in equally apportioning the marital estate. He contends the court failed to identify all of the marital assets and the contributions of the parties. In particular, he asserts the court erred by failing to include Wife's earned annual leave as a marital asset subject to apportionment and excluding Husband's postseparation financial contributions toward the mortgage and preseparation physical improvements to the marital home. He also maintains that the overall distribution is unfair under the circumstances. Husband also contends Wife conceded in her closing argument that "this case could be considered for a 60/40 distribution," and a fair evaluation of the equitable apportionment factors warrants a finding he is entitled to a split of sixty-forty in his favor. We disagree.

"The division of marital property is within the discretion of the family court and will not be disturbed on appeal absent an abuse of discretion." *Crossland,* 408 S.C. at 455, 759 S.E.2d at 425. "Equitable distribution of marital property 'is based on the recognition that marriage is, among other things, an economic partnership.'" *Id.* at 456, 759 S.E.2d at 426 (quoting *Morris v. Morris,* 335 S.C. 525, 517 S.E.2d 720 (Ct.App.1999)). "Upon dissolution of the marriage, marital property should be divided and distributed in a manner which fairly reflects each spouse's contribution to its acquisition, regardless of who holds legal title." *Id.* "The

ultimate goal of [equitable] apportionment is to divide the marital estate, as a whole, in a manner that fairly reflects each spouse's contribution to the economic partnership and also the effect on each of the parties of ending that partnership." *King v. King,* 384 S.C. 134, 143, 681 S.E.2d 609, 614 (Ct.App. 2009). "On review, this court looks to the overall fairness of the apportionment, and if the end result is equitable, that this court might have weighed specific factors differently than the family court is irrelevant." *Morris,* 335 S.C. at 531, 517 S.E.2d at 723. "Even if the family court commits error in distributing marital property, that error will be deemed harmless if the overall distribution is fair." *Doe v. Doe,* 370 S.C. 206, 214, 634 S.E.2d 51, 55 (Ct.App.2006).

In making an equitable apportionment of marital property, the family court "must give weight in such proportion as it finds appropriate" to all of the following factors:

(1) the duration of the marriage together with the ages of the parties at the time of the marriage and at the time of the divorce ...; (2) marital misconduct or fault of either or both parties, whether or not used as a basis for a divorce as such, if the misconduct affects or has affected the economic circumstances of the parties, or contributed to the breakup of the marriage ...; (3) the value of the marital property.... The contribution of each spouse to the acquisition, preservation, depreciation, or appreciation in value of the marital property, including the contribution of the spouse as homemaker; provided, that the court shall consider the quality of the contribution as well as its factual existence; (4) the income of each spouse, the earning potential of each spouse, and the opportunity for future acquisition of capital assets; (5) the health, both physical and emotional, of each spouse; (6) the need of each spouse or either spouse for additional training or education in order to achieve that spouse's income potential; (7) the nonmarital property of each spouse; (8) the existence or nonexistence of vested retirement benefits for each or either spouse; (9) whether ... alimony has been awarded; (10) the desirability of awarding the family home ...; (11) the tax consequences to each or either party ...; (12) the existence and extent of any support obligations, from a prior marriage or for any other reason or reasons, of either party; (13) liens and any

other encumbrances upon the marital property ...; (14) child custody arrangements and obligations at the time of the entry of the order; and (15) such other relevant factors as the trial court shall expressly enumerate in its order. S.C.Code Ann. § 20–3–620(B) (2014).

 Though our courts have held there is no recognized presumption in favor of a fifty-fifty division, we have approved an equal division of marital property "as an appropriate starting point for a family court judge attempting to divide an estate of a long-term marriage." *Crossland*, 408 S.C. at 456–57, 759 S.E.2d at 426. Further, while a spouse's adultery that causes the breakup of a marriage is an appropriate consideration for equitable apportionment, our courts "have consistently held that fault does not justify a severe penalty." *Doe*, 370 S.C. at 215, 634 S.E.2d at 56. Our laws do not "sanction the consideration of fault as a permissible punitive factor." *Id.* at 216, 634 S.E.2d at 56–57.

In regard to equitable distribution, the family court found, despite Wife's adultery and its role in the demise of the marriage, Wife made a greater financial contribution to the marital estate. It determined the marital estate should be divided fifty-fifty. The court found the $117,917 from the sale of the marital home should be divided equally after deducting $11,313 for the Guardian ad Litem fees. It found the debts should also be divided equally, with the exception of repair of the air conditioning system on the marital home in the amount of $3,950, which was to be reimbursed by Wife. The family court also found the marital value of Wife's retirement account was $94,904.46 and her pension account was $466,244, and these assets were to be divided equally between the parties. As to other items of marital property, the family court found the parties' agreement as to division to be fair and equitable, and incorporated that agreement into the order.

 First, we find Husband's arguments that the family court erred by failing to include Wife's earned annual leave and by excluding Husband's postseparation financial contributions toward the mortgage and preseparation physical improvements to the marital home are not preserved. Although Husband testified at trial that he made preseparation home improvements and postseparation mortgage payments, and

counsel for Husband specifically asked for equitable distribution of Wife's annual leave in his closing argument to the family court, there is nothing to indicate Husband raised to the family court any error in the court's failure to include these matters in apportioning the marital property. While the record contains an order on Husband's motion to alter or amend the family court's divorce order pursuant to Rule 59(e), SCRCP, this order simply indicates that, with the exception of modification of Husband's visitation, the family court denied Husband's motion "as to all matters." It does not indicate what other arguments Husband may have made. Further, the motion to alter or amend is not included in the record on appeal. *See Taylor v. Taylor,* 294 S.C. 296, 299, 363 S.E.2d 909, 911 (Ct.App.1987) ("The burden is on the appellant to furnish a sufficient record on appeal from which this court can make an intelligent review."). "When the family court does not rule on an issue presented to it, the issue must be raised by a post-trial motion to be preserved for appeal." *Bodkin v. Bodkin,* 388 S.C. 203, 219, 694 S.E.2d 230, 239 (Ct.App.2010). If a party then fails to raise the issues in a Rule 59(e) motion, they are unpreserved for our review. *Id.* Because the family court did not rule on these matters, and there is nothing in the record to indicate Husband raised them in a posttrial motion, they are not preserved.

As to Husband's argument that the overall distribution is unfair, we disagree. Admittedly, Wife was at fault in the breakdown of the marriage and she has a greater earning capacity. However, we disagree with Husband's assertion that Wife has significant nonmarital assets in the form of her retirement accounts, as only three years of her retirement was nonmarital and the bulk of her retirement accounts were considered marital and divided equally with Husband. As well, though Husband may have contributed financially to the household and put labor into the marital home, he has characterized Wife as the primary breadwinner throughout the marriage. Thus, her contributions to the marital home are likely, at a minimum, equal to that of Husband's. Additionally, Wife made the sole financial contributions to her retirement accounts, the bulk of which were divided evenly with Husband. Lastly, we do not agree with Husband's assertion that Wife conceded a sixty-forty split of the marital estate in

favor of Husband might be warranted. In closing argument, Wife's counsel did state Wife requested "the fees be split fifty-fifty or if the court were to take into consideration the adultery, sixty-forty." However, that was only a reference to *fees*, not equitable distribution of the parties' marital estate. Counsel stated that Wife asked "that their debts and assets be equitably divided." This was the only reference to the division of the marital estate. Further, we find nothing in the record to indicate Husband sought a greater split than fifty-fifty for equitable distribution. Other than asking for "equitable" distribution, Husband has only suggested an "equal" division of some of the assets and all of the debts. In sum, upon review of the entire record and after consideration of the relevant factors, we find the fifty-fifty division as a whole is fair. Accordingly, we affirm the division.

## III. Contempt

Husband argued in his brief that the family court erred in failing to hold Wife in criminal contempt for violating the court's restraining order by repeatedly disparaging Husband in Daughter's presence. However, at the time of oral argument, Husband conceded he no longer desired to proceed on the matters of contempt. At any rate, a review of the record convinces us Husband has not clearly and specifically shown Wife's contemptuous conduct. *See Hawkins v. Mullins,* 359 S.C. 497, 501, 597 S.E.2d 897, 899 (Ct.App.2004) ("Before a party may be found in contempt, the record must clearly and specifically show the contemptuous conduct.").

## IV. Attorney's Fees

Lastly, Husband contends the family court erred in failing to require Wife to contribute to his attorney's fees and costs.

The family court may, after considering the financial resources and marital fault of both parties, order one party to pay a reasonable amount to the other party for attorney's fees and costs incurred in maintaining an action for divorce. S.C.Code Ann. § 20–3–130(H) (2014). In deciding whether to award attorney's fees and costs, the court should consider the following factors: (1) the ability of the party to

pay the fees; (2) beneficial results obtained; (3) the financial conditions of the parties; and (4) the effect a fee award will have on the party's standard of living. *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). In determining the amount of reasonable attorney's fees, the court should consider the following six factors: (1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) the professional standing of counsel; (4) the contingency of compensation; (5) beneficial results obtained; and (6) customary legal fees for similar services. *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991).

Recognizing Husband was required to prove Wife's adultery due to Wife's denial in her responsive pleadings, the family court ordered Wife to reimburse Husband for the fees of Husband's forensic computer expert. Other than these fees, the family court ordered the parties to pay their own attorney's fees, and that the fees of the Guardian ad Litem and Dr. Saylor be divided equally between them. This is the extent of the family court's order on this matter, and there is no indication the family court considered any of the *E.D.M.* factors in deciding whether to make an award of attorney's fees and costs. Notably, there is no indication the family court gave any consideration whatsoever to financial considerations, i.e., the abilities of the parties to pay, the financial conditions of the parties, and the effect an award would have on the parties. Additionally, a remand on this matter is appropriate in light of our decision to reverse the denial of permanent periodic alimony and remand for the family court to determine the appropriate amount of permanent periodic alimony to award. *See Rogers v. Rogers*, 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001) ("[S]ince the beneficial result obtained by counsel is a factor in awarding attorney's fees, when that result is reversed on appeal, the attorney's fee award must also be reconsidered.").

**CONCLUSION**

Based on the foregoing, we (1) reverse the denial of permanent periodic alimony to Husband and remand to the family court for a determination of the appropriate award, retroactive to the date of the original hearing, (2) affirm the equal apportionment of the marital estate, (3) affirm the family

court's decision declining to hold Wife in contempt, and (4) remand the issue of attorney's fees for reconsideration.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

SHORT and KONDUROS, JJ., concur.